# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GEOFFREY "REFF" SYKES, REFF HOLLINGS PTY LTD., SHODOGG PTY LTD., and MASH IN MUSIC PTY LTD., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0861-SG |
| TOUCHSTREAM TECHNOLOGIES, INC., d/b/a SHODOGG, TOUCHSTREAM ANZ, LLC, HERBERT MITSCHELE, JOHN BURNS, and DAVID STROBER, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 7, 2023
Date Decided:  March 27, 2024

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; OF COUNSEL: Scott C. McAdam, LAW OFFICE OF SCOTT C. MCADAM, Henderson, Nevada, *Attorneys for Plaintiffs*.

Sean A. Meluney, William M. Alleman, Jr., and Stephen A. Spence, MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

The individual Plaintiff here, Geoffrey "Reff" Sykes, is an investor and equity holder in Defendant Touchstream Technologies, Inc., d/b/a Shodogg ("Shodogg"). Sykes seeks to vindicate his creditor and equity rights in Shodogg through this litigation under a variety of theories. Shodogg is a repeat litigator here, a kind of *Canis Familiaris* in the Court of Chancery.[1] This latest addition to the Shodogg litter involves the Defendants' Motion to Dismiss the Amended Complaint, under Rule 12 (b)(6). In this Memorandum Opinion, I examine the various counts of the Amended Complaint, finding, generally speaking, that Plaintiffs' legal claims seeking declaratory judgment stand, but that his fiduciary-duty claims and fraud claim are deficient. My reasoning follows a statement of the facts alleged, below.

## I. BACKGROUND

*A. Factual Background*

The following facts are taken from the Amended Complaint, and presumed true for purposes of my analysis.

### 1. The Parties

Plaintiff Geoffrey "Reff" Sykes is a resident of Australia.[2]

---

[1] *See Fetch Interactive Television LLC v. Touchstream Techs. Inc.*, 2019 WL 193921 (Del. Ch. Jan. 15, 2019); *Fetch Interactive Television LLC v. Touchstream Techs. Inc.*, 2022 WL 4462165 (Del. Ch. Sept. 26, 2022); *Fetch Interactive Television LLC v. Touchstream Techs. Inc.*, 2023 WL 3265128 (Del. Ch. May 5, 2023).

[2] Verified Am. Compl. ¶ 6, Dkt. No. 13 ("Am. Compl.").

Plaintiff Reff Holdings PTY LTD ("Reff Holdings") is a proprietary limited company formed under the laws of Australia, with its principal place of business Queensland.[3] Sykes founded Reff Holdings on October 20, 2011.[4]

Plaintiff Shodogg PTY LTD is a proprietary limited company formed under the laws of Australia with its principal place of business in Sydney, Australia.[5] Sykes founded Shodogg PTY LTD on August 31, 2011.[6]

Plaintiff Mash in Music PTY LTD ("Mash in Music" and collectively with Sykes, Reff Holdings, and Shodogg PTY LTD, "Plaintiffs") is a proprietary limited company formed under the laws of Australia, with its principal place of business in Sydney, Australia.[7] Shodogg founded Mash in Music on October 8, 2015.[8]

Defendant Touchstream Technologies, Inc., d/b/a Shodogg ("Shodogg"), is a corporation formed and existing under the laws of Delaware.[9] Shodogg was co-founded by Sykes and Defendant Herbert Mitschele in 2011.[10]

---

[3] *Id.* ¶ 7.
[4] *Id.*
[5] *Id.* ¶ 8.
[6] *Id.*
[7] *Id.* ¶ 9.
[8] *Id.*
[9] *Id.* ¶ 10.
[10] *Id.* ¶ 6.

2

Defendant Herbert Mitschele is a resident of Pennsylvania, who serves as the Chief Executive Officer of Shodogg and is a member of Shodogg's board of directors.[11]

Defendant John Burns is a resident of Canada and serves as the Chairman of Shodogg's board of directors.[12]

Defendant David Strober (collectively with Mitschele and Burns, the "Individual Defendants") is a resident of New York and serves as a director on Shodogg's board of directors.[13]

Defendant Touchstream ANZ, LLC (collectively with Shodogg, Mitschele, Burns, and Strober, "Defendants") is a limited liability company formed under the laws of Delaware and an affiliate of Shodogg.[14]

### 2. Sykes and Mitschele Found Shodogg

In 2011, Sykes and Mitschele, among others, co-founded Shodogg.[15] Shodogg is a software development company that developed at least four significant patents related to "casting" media content from one device to another (the "Shodogg Patents").[16] At its founding, Sykes contributed capital to Shodogg's development.[17]

---

[11] *Id.* ¶ 11.
[12] *Id.* ¶ 12.
[13] *Id.* ¶ 13.
[14] *Id.* ¶ 14.
[15] *Id.* ¶ 16.
[16] *Id.*
[17] *Id.* ¶ 17.

In exchange for the capital and his efforts in establishing and growing Shodogg globally, Sykes received 3% equity interest in Shodogg.[18]

### 3. Sykes and Mitschele Establish a Joint Venture

On August 1, 2011, Sykes and Mitschele negotiated the terms of a Joint Venture Agreement (the "JV Agreement") to develop and deploy Shodogg's intellectual property in the Australian and New Zealand markets.[19] Sykes, through Reff Holdings, loaned money to the joint venture.[20] These loans were recorded in the financial documents of Shodogg PTY LTD.[21] Section 6.4 of the JV Agreement provides Sykes with an annual salary of $180,000.[22] The JV Agreement acknowledges that Sykes made a "Capital Contribution" of $125,000 to Shodogg PTY LTD.[23]

For the next two-and-a-half years, Sykes worked to help Defendants develop Shodogg's software and products.[24] Sykes also established Shodogg's presence in Australia and New Zealand while contributing to Shoodgg's global business.[25] Although Sykes was working for Shodogg during this time, Defendants asked Sykes

---

[18] *Id.*
[19] *Id.* ¶ 19.
[20] *Id.* ¶ 21.
[21] *Id.*
[22] *Id.* ¶ 22.
[23] *Id.* ¶ 24.
[24] *Id.* ¶ 28.
[25] *Id.*

to defer his salary that was guaranteed under the JV Agreement.[26] Sykes agreed to do so while continuing to invest capital into Shodogg's development.[27]

The JV Agreement states that the JV Agreement will terminate upon mutual agreement of the parties in writing.[28] However, the termination of the JV "Agreement shall not release a party from any obligations or liabilities to the other parties, whether pursuant to the provisions of this Agreement or at law or in equity."[29] If the JV Agreement is terminated, Shodogg PTY LTD "shall be wound up and assets and properties of [Shodogg PTY LTD] liquidated and distributed to the parties in accordance with the distribution priorities set forth in" the JV Agreement.[30]

### 4. Sykes and Mitschele Enter into the Amended and Restated Joint Venture Agreement

On April 1, 2014, Sykes and Mitschele entered into an Amended & Restated Joint Venture Agreement (the "A&R JV Agreement") to add Shodogg, the parent company of Touchstream ANZ, LLC, to the JV Agreement, along with Shodogg PTY LTD, the joint venture company.[31] The A&R JV Agreement provides that Sykes will receive an annual salary of $180,000.[32] Section 7.7 of the A&R JV

---

[26] *Id..*
[27] *Id.*
[28] *Id.* ¶ 25.
[29] *Id.* ¶ 26 (quoting Am. Compl., Ex. A § 17.2, Dkt. No. 13).
[30] *Id.* ¶ 27 (quoting Am. Compl., Ex. A § 17.3).
[31] *Id.* ¶¶ 29–30.
[32] *Id.* ¶ 31 (citing Am. Compl., Ex. B § 6.4, Dkt. No. 13).

Agreement states that Sykes made a "Capital Contribution" of $125,000 to Shodogg PTY LTD.[33] The A&R JV Agreement restated the sections regarding termination as first included in the JV Agreement, discussed above in Section I.A.3.[34]

### 5. Sykes and Shodogg Execute an Agreement to Terminate the Joint Venture Agreement

On January 13, 2015, Sykes and Mitschele, on behalf of Shodogg, entered into the Agreement to Terminate ANZ Joint Venture (the "JV Termination Agreement"), to terminate the A&R JV Agreement upon the occurrence of specific events.[35] Under the terms of the JV Termination Agreement, Sykes was promised "549,600 shares of the 6,058,550 available share [sic] pre series A" shares of Shodogg in exchange for his agreement to terminate the A&R JV Agreement.[36] The JV Termination Agreement further provided that "[a]n additional 56,255 shares will be transferred from [ ] Mitschele to [Sykes], to complete the 10% total equity holding of [Sykes] in [Shodogg]."[37] Sykes was further provided an executive level role with a starting annual salary of $100,000 in addition to healthcare benefits.[38]

The JV Termination Agreement lays out the process to terminate the parties' joint venture.[39] Specifically, the JV Termination Agreement provides that the joint

---

[33] *Id.* ¶ 33.
[34] *See id.* ¶¶ 34–36 (quoting Am. Compl., Ex. B §§ 16.1–16.3).
[35] *Id.* ¶ 37.
[36] *Id.* ¶ 39 (quoting Am. Compl., Ex. C, Dkt. No. 13).
[37] *Id.*
[38] *Id.*
[39] *Id.* ¶ 40.

venture would terminate on a date chosen by Shodogg, after the repayment of the joint venture's debt.[40] Upon the successful closure of bridge funding, Shodogg was to assume liability for the joint venture's debt.[41] The JV Termination Agreement states that Reff Holdings loaned Shodogg $565,000, accruing interest at an annual rate of 7%; that amount is deemed a "priority repayment."[42] The joint venture's debt was expected to be paid within a reasonable amount of time following the successful closure of Shodogg's Series B round funding.[43]

Since its execution in 2015, Shodogg has yet to repay Sykes's $565,000 loan and its associated interest.[44] Sykes has also not been provided the stock certificates representing the shares that were to be transferred to Sykes under the JV Termination Agreement.[45] Shodogg has never paid Sykes the $100,000 annual salary due to him under the terms of the JV Termination Agreement, nor the healthcare benefits associated with that salary.[46]

6. Sykes and Shodogg Execute the Licensing Agreement

On January 24, 2016, Sykes' entity, Mash in Music, entered a licensing agreement with Shodogg (the "Licensing Agreement").[47] Under the terms of the

---

[40] *Id.* (citing Am. Compl., Ex. C).
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.* ¶ 42.
[45] *Id.*
[46] *Id.*
[47] *Id.* ¶ 45.

Licensing Agreement, Sykes was provided a license to use Shodogg's intellectual property encompassed by the Shodogg Patents and the related casting technology that Shodogg developed in connection with the Shodogg Patents.[48] Sykes invested more than $700,000 in Mash in Music to develop and deploy the Shodogg technology in Australia and New Zealand, but Mash in Music needed to use the Shodogg Patents for its business model to be viable.[49] On April 20, 2017, Sykes and Shodogg execute an Addendum to the Licensing Agreement (the "Addendum") to extend the term of the Licensing Agreement.[50] On August 14, 2017, Shodogg shut off Sykes' cloud access to the Shodogg technology service, contrary to the terms of the Licensing Agreement,[51] but Sykes was still able to access Shodogg's technical software development services utilized to develop the software at the heart of the Licensing Agreement.[52]

### 7. Shodogg's 2017 Convertible Note Offering

In April 2017, Shodogg underwent a recapitalization to secure bridge funding that would be used, in part, to pursue a patent infringement action to enforce the Shodogg Patents.[53] These funds were raised via an issuance of convertible notes to

---

[48] *Id.*
[49] *Id.* ¶ 46.
[50] *Id.* ¶ 47.
[51] *Id.* ¶ 48.
[52] *Id.* ¶ 151.
[53] *Id.* ¶ 50.

existing investors (the "Convertible Note Offering" or the "Offering").[54]  On April 20, 2017, Mitschele informed Sykes that Sykes would be required to invest an additional $11,656.11 in the Convertible Note Offering or Sykes would lose 2.36% of his co-founder stock in Shodogg.[55]  If Sykes did not participate in the Convertible Note Offering, Sykes' ownership interest would be diluted down to less than one-tenth of one percent.[56]  On May 19, 2017, Sykes and Shodogg entered into a Convertible Note Purchase Agreement (the "Convertible Note").[57]  Under the Convertible Note, Sykes invested $50,000 in the Convertible Note Offering, with $11,656.11 being contributed to maintain Sykes' pre-Offering 2.36% equity interest in Shodogg.[58]  The excess amount contributed in the Offering that entitled Sykes to an additional 7.547% equity stake.[59]  The Convertible Note had a maturity date of June 30, 2022.[60]

### 8. Sykes Receives "Notice of Breach" Letters from Shodogg

On April 18, 2022, Defendant Burns, on behalf of Shodogg, sent Sykes a "Notice of Breach" letter concerning the Convertible Note Purchase Agreement (the "April 2022 Letter").[61]  In the letter, Shodogg alleged that Sykes (1) breached a

---

[54] *Id.* ¶¶ 50, 52.
[55] *Id.* ¶ 54.
[56] *Id.*
[57] *Id.* ¶ 55.
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.* ¶ 62.

restrictive covenant in the Convertible Note and (2) made a misrepresentation in the Convertible Note Purchase Agreement.[62] Shodogg threatened to sue Sykes for these breaches unless he agreed to voluntarily relinquish his rights under the Convertible Note Purchase Agreement and the accompanying Convertible Note.[63]

The following month, Mitschele, as CEO of Shodogg, emailed other parties who had participated in the Convertible Note Offering regarding the upcoming June 30, 2022 maturity date of the convertible notes to provide those parties with instructions to convert the notes to common stock in Shodogg prior to the maturity date (the "Conversion Notice").[64] Specifically, the Conversion Notice stated that participants would receive a separate email from Shodogg's legal counsel with a document that the recipient needed to complete and sign to convert their notes to common stock.[65] Despite having contributed $50,000 in the Offering, Sykes was excluded from the Conversion Notice and was not sent the document necessary to convert his convertible note to common stock.[66]

On May 31, 2022, Sykes received another "Notice of Breach" letter that referenced Sykes's alleged breach of the Convertible Note Purchase Agreement and threatened litigation against Sykes if he did not resolve the dispute by June 10,

---

[62] *Id.*
[63] *Id.*
[64] *Id.* ¶ 65.
[65] *Id.*
[66] *Id.*

2022.[67] Sykes received a "Follow-Up to Notice of Breach" letter on July 1, 2022.[68] The follow-up letter informed Sykes that his Convertible Note had matured without Sykes acting to convert his convertible note to common stock.[69] In the follow-up letter, Shodogg requested payment instructions for the return of Sykes's $50,000 used to participate in the Offering.[70] Shodogg threatened to sue Sykes if Sykes failed to respond to Shodogg's request by July 13, 2022.[71]

### 9. Shodogg Holds an Annual Meeting

On November 19, 2022, Shodogg sent out a "Notice Regarding Annual Meeting for [Shodogg]" (the "Annual Meeting Notice"), scheduled for December 20, 2022 (the "December Meeting"), with an agenda that included a board election of proposed nominees an attached proxy form.[72] Stockholders who wished to nominate an alternative slate of directors had until December 13, 2022, to do so.[73] This annual meeting was Shodogg's first annual meeting in more than five years.[74]

After receiving the Annual Meeting Notice, Sykes sent Shodogg a formal "Demand for Stockholder Information" on November 30, 2022.[75] In his demand,

---

[67] *Id.* ¶ 66.
[68] *Id.* ¶ 67.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* ¶ 71.
[73] *Id.* ¶ 76.
[74] *Id.* ¶ 71.
[75] *Id.* ¶ 73.

Sykes requested information necessary for Sykes to confirm his stock ownership and relative percentage of his vote in the director election, and contact other stockholders about a possible alternative slate of director candidates.[76] Two days later, Shodogg responded to Sykes's Demand for Stockholder Information by demanding that Sykes enter into a confidentiality agreement before Shodogg would produce any of the requested information to Sykes.[77] Sykes returned the executed confidentiality agreement to Shodogg on December 6, 2022.[78]

Subsequently, Shodogg provided Sykes with a capitalization table dated December 7, 2022 (the "December Cap Table").[79] The December Cap Table reflected that Sykes' equity interest in Shodogg was 0.041% and not the 20.547% that, up until receipt of the December Cap Tables, Sykes believed he owned.[80] On December 9, 2022, Shodogg provided Sykes with its Shodogg's stockholder list that included physical and email addresses for all current stockholders.[81] The stockholder list did not include the stockholders' respective equity positions nor the stockholders' phone numbers, despite Sykes' demand for that information.[82]

---

[76] *Id.*
[77] *Id.* ¶ 75.
[78] *Id.* ¶ 76.
[79] *Id.* ¶ 77.
[80] *Id.* ¶ 78.
[81] *Id.* ¶ 79.
[82] *Id.*

On December 13, 2022, Sykes emailed Mitschele to request Shodogg provide remote video access for stockholders to attend the December Meeting.[83] Shodogg had not responded to this request when Sykes sent Mitschele another request for remote video access for stockholders on December 19, 2022.[84] Later that day, Mitschele circulated a telephone number for stockholders to use to call into the December Meeting.[85]

The December Meeting began at 3:00 pm.[86] The stockholders who dialed in for the annual meeting using the telephone number provided by Mitschele were permitted only to listen and were unable to be heard by other participants.[87] At 3:11 pm, the telephone participants were disconnected and removed from the December Meeting.[88] It was not until after the telephonic participants were removed from the December Meeting that Shodogg conducted the election process for the board of directors.[89]

Prior to the start of the December Meeting, Sykes submitted written questions to Shodogg's board in the manner prescribed by Shodogg for remote attendees to do

---

[83] *Id.* ¶ 80.
[84] *Id.* ¶ 81.
[85] *Id.*
[86] *Id.* ¶ 84.
[87] *Id.* ¶ 83.
[88] *Id.* ¶ 84.
[89] *Id.*

so.[90] Those questions were not addressed at the December Meeting.[91] Upon being removed from the December Meeting, Sykes emailed Mitschele the same list of written questions.[92] Sykes sent a follow-up email on January 5, 2023, to request that his written questions be addressed and to be sent a copy of Shodogg's meeting minutes from the December Meeting.[93] When Mitschele responded on January 10, 2023, he refused to answer Sykes' questions and failed to provide Sykes with a copy of the December Meeting minutes.[94] Sykes requested the December Meeting minutes twice more before Mitschele agreed to give Sykes a copy, so long as Sykes agreed that those minutes were subject to the confidentiality agreement Sykes had signed on December 6, 2022.[95] Sykes executed a new version of the confidentiality agreement on February 8, 2023, and was provided a copy of the December Meeting minutes on February 9, 2023.[96]

*B. Procedural History*

Plaintiffs filed suit on September 26, 2022,[97] before filing the operative complaint on March 20, 2023 (the "Amended Complaint").[98]   The Amended

---

[90] *Id.* ¶ 82.
[91] *See id.* ¶ 86.
[92] *Id.*
[93] *Id.* ¶ 87.
[94] *Id.* ¶ 88.
[95] *Id.* ¶¶ 89–90.
[96] *Id.* ¶ 90.
[97] *See* Verified Compl. for Inj. Relief, Decl. Relief, and Damages, Dkt. No. 1.
[98] *See* Am. Compl.

Complaint contains nine causes of action: (1) declaratory relief with respect to the validity of the Convertible Note Purchase Agreement; (2) declaratory relief with respect to Sykes' total holdings in Shodogg; (3) specific performance of the JV Termination Agreement; (4) fraud; (5) breach of contract with respect to the JV Agreement and the A&R JV Agreement; (6) breach of contract with respect to the Licensing Agreement and Amendment thereto; (7) breach of fiduciary duty against Mitschele; (8) breach of fiduciary duty against Burns; and (9) breach of fiduciary duty against Strober.[99] Defendants moved to dismiss the Amended Complaint for failure to state a claim on April 19, 2023.[100] The parties finished briefing the motion to dismiss on June 12, 2023.[101] I heard oral argument on December 7, 2023, and consider the matter fully submitted as of that date.[102]

## II. ANALYSIS

### A. Standards of Review

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim.[103]

The standard for reviewing a motion to dismiss under Rule 12(b)(6) is well settled:

[99] *Id.* ¶¶ 98–170.
[100] *See* Defs.' Mot. to Dismiss Am. Compl., Dkt. No. 16 ("Defs.' OB").
[101] *See* Defs.' Reply Br. Supp. Mot. to Dismiss Am. Compl., Dkt. No. 19 ("Defs.' RB").
[102] *See* Judicial Action Form re Mot. to Dismiss before Vice Chancellor Glasscock dated 12.7.23, Dkt. No. 21.
[103] *See* Defs.' OB 13–14.

15

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[104]

The Court need not, however, "accept as true conclusory allegations without specific supporting factual allegations."[105]

*B. Counts I and II: Declaratory Judgment*

Where a plaintiff seeks to have the Court consider a claim for declaratory judgment, that plaintiff must sufficiently allege that: (1) the dispute "involve[s] a claim of right or other legal interest of the party seeking declaratory relief;" (2) the party against whom the claim is asserted "has an interest in contesting the claim;" (3) the parties' "conflicting interests [are] real and adverse; and (4) the issue [is] ripe for judicial determination."[106]

1. Plaintiffs State Claims for Declaratory Judgment

In Count I, Plaintiffs seek declaratory judgment that the Convertible Note Purchase Agreement is a valid, enforceable contract by which Sykes purchased equity in Shodogg in the form of a $50,000 Convertible Note.[107] In Count II, Plaintiffs further seek declaratory judgment that Sykes owns 20.547% equity interest

---

[104] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).
[105] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).
[106] *Mehiel v. Solo Cup, Co.*, 2005 WL 1252348, at *4 (Del. Ch. May 13, 2005).
[107] Am. Compl. ¶ 99.

in Shodogg, comprised of (a) 9.907% equity interest pursuant to the Convertible Note Purchase Agreement; (b) 10% equity interest pursuant to the JV Termination Agreement; and (c) 0.64% equity interest that constitutes the balance of Sykes' 3% co-founder shares less the 2.36% that was repurchased in the Convertible Note Offering.[108]

### a. Count I: Declaratory Judgment for the Convertible Note

Defendants ask that Count I be dismissed because it is redundant and subsumed by Count II.[109] Plaintiffs acknowledge that their equity holding in Shodogg under the Convertible Note is "*part* of the declaratory relief Sykes seeks in both Counts I and II[.]"[110] While the validity and enforceability of the Convertible Note will be assessed by the Court in deciding Count II, Plaintiffs can only recover once if the Convertible Note is found to be valid and enforceable under both Counts I and II. I decline to dismiss Count I merely for redundancy.[111]

Defendants next contend that Count I fails as a matter of law because convertible notes are debt instruments that only give the note holder the option to convert the note into equity prior to the maturity date, which Sykes failed to do.[112] In response, Plaintiffs explain that Sykes intended to convert the Convertible Note

---

[108] *Id.* ¶ 107.
[109] Defs.' OB 15; Defs.' RB 3–4.
[110] Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss 22, Dkt. No. 18 ("Pls.' AB").
[111] *See Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (explaining that dismissal for redundancy is within the Court's discretion).
[112] Defs.' OB 15–20; Defs.' RB 5–7.

into equity, however, Defendants excluded Sykes from receiving the instructions on how to convert included in the Conversion Notice.[113]  Taking Plaintiffs' well-pled allegations as true, it is reasonable to infer that Defendants acted to prevent Plaintiffs from exercising their contractual right to convert the Convertible Note to equity.  By asserting Count I, Plaintiffs seek to have that contractual right determined by the Court.  Therefore, Plaintiffs have stated a claim for declaratory judgment regarding the validity and enforceability of the Convertible Note.

### b. Count II: Declaratory Judgment Regarding Total Equity Holdings

Defendants assert that Count II should be dismissed by mounting arguments against each individual component that Plaintiffs allege in support of their contention that they own 20.547% equity interest in Shodogg.[114]  Specifically, Defendants reassert their argument that Sykes did not purchase equity under the Convertible Note.[115] Defendants also argue that Plaintiffs' 0.64% equity attributable to Sykes' co-founder shares is calculated incorrectly because the 0.64% is based on Plaintiffs' incorrect assertion that Sykes purchased equity under the Convertible Note.[116]  Similarly, Defendants aver that Plaintiffs' asserted 10% equity holding

---

[113] Pls.' AB 23–27.
[114] *See* Defs.' OB 20–23; Defs.' RB 7–9.
[115] Defs.' OB 20–21; Defs.' RB 8.
[116] Defs.' OB 22–23; Defs.' RB 9.

18

under the JV Termination Agreement is untimely, mathematically impossible, and waived by Plaintiffs' participation in the Convertible Offering.[117]

It is not my practice to grant motions to dismiss piecemeal by reviewing each allegation underlying a cause of action to confirm whether those allegations individually state a cause of action.[118] Here, Plaintiffs have adequately alleged that their equity holding in Shodogg is 20.547%, which Shodogg contests by asserting that Plaintiffs' equity holdings amount to only 0.041%. There is a present dispute between the parties regarding the quantum of equity holdings in Shodogg held by Plaintiffs, and parties who have an interest in contesting the claimed ownership. Therefore, Defendants' motion to dismiss Count II for failure to state a claim is denied.

### c. Proper Defendants for Counts I and II

Defendants argue that Plaintiffs improperly assert their claims for declaratory judgment against the Individual Defendants.[119] According to Defendants, only Shodogg has a cognizable interest in determining Sykes' degree of equity ownership in Shodogg.[120] In response, Plaintiffs argue that declaratory judgment is appropriate

---

[117] Defs.' OB 21–22; Defs.' RB 8.
[118] *See Glob. Discovery BioSciences Corp. v. Harrington*, C.A. No. 2022-1132-SG, at 5–6 (Del. Ch. Aug. 17, 2023) (TRANSCRIPT).
[119] *See* Defs.' OB 20–21; Defs.' RB 4, 7.
[120] Defs.' OB 21; Defs.' RB 4, 8.

against all Defendants, including the Individual Defendants, because an entity cannot act without its officers and directors taking actions.[121]

As explained above, a claim for declaratory relief "must be asserted against one who has an interest in contesting the claim."[122] Here, the defendant with an interest in contesting Plaintiffs' claim seeking declaratory judgment regarding Plaintiffs' ownership in Shodogg is Shodogg itself. The relief sought by Plaintiffs is a declaration that Plaintiffs' equity holdings in Shodogg is greater than the 0.041% Shodogg contends it is. If Plaintiffs are ultimately successful and awarded this relief, Shodogg would be the party required to acknowledge Plaintiffs' adjudicated equity holdings.

While Plaintiffs are correct that a corporation cannot act unless an agent of the corporation acts on behalf of the corporation,[123] complete relief for Plaintiffs' claims for *declaratory judgment* is available only from Shodogg.

*C. Count III: Specific Performance*

In the Amended Complaint, Plaintiffs also seek specific performance of Shodogg's obligations under the JV Termination Agreement, including repayment of Sykes' loans, 10% equity interest in Shodogg, and payment of Sykes' annual

---

[121] Pls.' AB 21–22, 28.
[122] *Mehiel*, 2005 WL 1252348, at *4.
[123] *See Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015) ("Because it lacks a body and mind, a corporation only can act through human agents").

salary and benefits.[124]  Defendants argue that Count III is time-barred and should be dismissed.[125]  Plaintiffs assert that Count III is not barred by laches and, in the alternative, that the Amended Complaint pleads sufficient facts for the Court to toll the running of the analogous statute of limitations.[126]

Laches is an affirmative defense that "generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant."[127]  The existence of these elements "is generally determined by a fact-based inquiry."[128]  Accordingly, laches is "not ordinarily well-suited for treatment on" a Rule 12(b)(6) motion to dismiss.[129]  Even where the statute of limitations applies by analogy, tolling is a fact-intensive matter as well.  Given the limited factual record before me, I decline to dismiss Count III at this time.

*D. Count IV: Fraud*

Plaintiffs assert a claim for fraud, fraud in the inducement, and fraudulent conspiracy.[130]  Defendants contend that Count IV is improper bootstrapping, time-barred, and does not satisfy the pleading requirements of Rule 9(b).[131]  Plaintiffs

---

[124] Am. Compl. ¶¶ 110–18.
[125] Defs.' OB 23–29; Defs.' RB 9–15.
[126] Pls.' AB 31–39.
[127] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).
[128] *Id.*
[129] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).
[130] Am. Compl. ¶¶ 119–29.
[131] Defs.' OB 29–33; Defs.' RB 16–18.

retort that the fraud claim, as pled, satisfies Rule 9(b); is not improper bootstrapping because it satisfies an exception recognized by the Court; and could not have been brought until Defendants sent the April 2022 Letter that revealed Defendants' true intent to never perform their contractual obligations.[132]

Even if the fraud claim states satisfies Rule 9(b)'s heightened pleading standard, "Delaware law holds that a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations."[133] An example of improper bootstrapping would be where a plaintiff "couch[es] an alleged failure to comply with a contract as a failure to disclose an intention to take certain actions arguably inconsistent with that contract[.]"[134] This Court has explained that bootstrapping is improper where "the plaintiff has simply tacked on conclusory allegations that the defendant made the contract knowing it would not or could not deliver on its promises."[135] However, a fraud claim may be brought alongside a breach of contract claim without constituting "improper bootstrapping" if, for example, the "plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation[.]"[136]

---

[132] Pls.' AB 39–46.
[133] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010).
[134] *Id.*
[135] *Pilot Air Freight, LLC v. Manna Freights, Sys.*, 2020 WL 5588671, at *25 (Del. Ch. Sept. 18, 2020).
[136] *Id.* at *26.

Plaintiffs' fraud claim is improper bootstrapping. Plaintiffs have asserted claims for breach of contract against Defendants based on Defendants' failure to comply with their contractual obligations under the JV Agreement, the A&R JV Agreement, and the Licensing Agreement and Addendum thereto. Plaintiffs' fraud claim rests on the allegation that, at the time of entering of these agreements, Defendants failed to disclose to Plaintiffs that Defendants never intended to perform or abide under the agreements.[137] While Plaintiffs aver that these allegations are sufficient to show that Defendants "knew contractual representations were false or lied regarding the contractual representation," and therefore fall into the "anti-bootstrapping" rule, I disagree.

Plaintiffs do not point to a specific contractual representation that Defendants knew was false or lied about. Rather, Plaintiffs have tacked onto their breach of contract claims conclusory allegations that Defendants never intended to perform under the contracts. Plaintiffs' allegations, in my view, fall squarely within the definition of improper bootstrapping.[138] Thus, Count IV for fraud is dismissed.[139]

---

[137] Am. Compl. ¶¶ 120–22.

[138] *See Pilot Air Freight, LLC*, 2020 WL 5588671, at *25 (explaining that improper bootstrapping occurs where "the plaintiff has simply tacked on conclusory allegations that the defendant made the contract knowing it would not or could not deliver on its promises.").

[139] Since I have concluded that Count IV must be dismissed as improper bootstrapping, I decline to address Defendants' assertions that Count IV is time-barred and fails to comply with the heightened pleading standards under Rule 9(b).

*E. Breach of Contract Claims: Counts V and VI*

Plaintiffs bring two breach of contract claims against Defendants for breaching (1) the JV Agreement and the A&R JV Agreement and (2) the Licensing Agreement and Addendum thereto.[140]

To state a claim for breach of contract, a plaintiff must allege "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[141] In determining whether a plaintiff has sufficiently pled the existence of a contract and a breach of an obligation contained therein, "the [C]ourt must consider, and often construe the proffered contract at the heart of the claim[.]"[142] Although "[t]he construction of a contract is a question of law,"[143] the Court will not grant a defendant's motion to dismiss a breach of contract claim "under Rule 12(b)(6) unless the interpretation of the contract on which [defendant's] theory of the case rests is the *only* reasonable construction as a matter of law."[144]

---

[140] Am. Compl. ¶¶ 130–55.

[141] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[142] *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *14 (Del. Ch. Feb. 24, 2020).

[143] *Id.*

[144] *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008) (emphasis in original) (internal quotations omitted).

1. <u>Count V: Breach of the JV Agreement and the A&R JV Agreement</u>

Plaintiffs contend that Defendants breached the JV Agreement and the A&R JV Agreement by failing to: (a) repay Sykes' loans to and investments in the joint venture; (b) provide Sykes with shares in Shodogg; (c) provide Sykes a salary; (d) failing to keep Sykes informed of "Other IP;" and (e) recognize Sykes' work with Chinese companies.[145]  Defendants seek dismissal of Count V because Plaintiffs fail to cite the provisions in the contract that impose the alleged obligations on Defendants and on the grounds that the claim is time-barred.[146]

a. Whether the Cited Provisions Support Plaintiffs' Claim

Plaintiffs have facially stated a claim for breach of the JV Agreement and the A&R JV Agreement.  Defendants argue that the provisions relied upon by Plaintiffs in stating the claim do not impose the obligations that Plaintiffs allege were breached.[147]

Under the incorporation by reference doctrine, a Court may review documents relied upon by plaintiffs in asserting a claim to confirm that plaintiffs have not misconstrued the contents.[148]  The Court, however, cannot review the documents when the parties fail to provide those documents to the Court.  Defendants advocate

---

[145] Am. Compl. ¶ 133.
[146] Defs.' OB 33–37; Defs.' RB 19–21.
[147] Defs.' OB 34–37.
[148] *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1181 (Del. Ch. 2022).

for dismissal by explaining their understanding of each section of the contracts relied upon by Plaintiffs.[149]  However, the JV Agreement and the A&R JV Agreement are not included as exhibits to the Amended Complaint nor included as exhibits in the pleadings, so I cannot refer to them to determine whether Plaintiffs have accurately represented their contents.[150]  Accordingly, Defendants' motion to dismiss Count V is denied without prejudice to any motion for partial summary judgment upon a record sufficient to support Defendants' contractual contentions.

### b. Timeliness of Plaintiffs' Claim

The statute of limitations for breach of contract claims is three years from the accrual of the cause of action.[151]  A claim for breach of contract does not accrue until the breach occurs.[152]  Delaware courts recognize that circumstances may exist that warrant the tolling of the statute of limitations for a period of time.[153]  At the motion to dismiss stage, the Court must accept all facts pled in the complaint as true.[154]  If the complaint pleads facts sufficient to demonstrate that the Court should toll the statute of limitations, this Court will not dismiss the complaint.[155]

---

[149] Defs.' OB 36–37.
[150] *See* Letter to the Ct. re: Certain Exs. Filed with the Am. Compl., Dkt. No. 15.
[151] 10 *Del. C.* § 8106.
[152] *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005).
[153] *See Collis*, 287 A.3d at 1211–21 (explaining different tolling doctrines utilized by Delaware courts).
[154] *Savor, Inc.*, 812 A.2d at 896–97.
[155] *Certainteed Corp.*, 2005 WL 217032, at *6.

Defendants generally assert that the statute of limitations ran at least three years before Plaintiffs filed suit by relying on the execution dates of the JV Agreement and the A&R JV Agreement.[156]  Plaintiffs allege that Defendants repeatedly reassured Plaintiffs that the Defendants intended to comply with the obligations laid out in the JV Agreement and A&R JV Agreement.[157]  Thus, Plaintiffs only became aware that Defendants' intention to breach the contracts when Defendants stated so in the April 2022 Letter.[158]

The facts alleged in the Amended Complaint demonstrate reasonably conceivable grounds for tolling the statute of limitations.  For example, the Amended Complaint sufficiently pleads that Defendants owed Sykes a salary and were obligated to repay Sykes for amounts he owed to the joint venture.[159]  Although Sykes was not paid his salary nor repaid for loans, the Amended Complaint adequately alleges that Defendants requested that Sykes defer exercising his rights to monetary compensation while assuring Sykes that those contractual obligations still existed and would be performed once Defendants succeeded in patent infringement actions involving the Shodogg Patents.[160]  As alleged by Plaintiffs, Defendants' inability to pay Sykes' salary under the contracts was a result of funding

---

[156] Defs.' OB 33–34; Defs.' RB 19.
[157] Pls.' AB 49 (citing Am. Compl. ¶¶ 62, 114, 124).
[158] *Id.*
[159] *See* Am. Compl. ¶¶ 18–36.
[160] *See id.* ¶ 49.

limitations, which Defendants acknowledged in a 2020 email.[161] Plaintiffs have plead sufficient facts to make it reasonably conceivable that a tolling doctrine may apply, which, if so, makes Count V timely.[162] Therefore, I decline to dismiss Count V as time-barred.

### 2. Count VI: Breach of the Licensing Agreement and Addendum

Plaintiffs also assert a claim for breach of the Licensing Agreement and Addendum thereto based on Defendants turning off Sykes' access to the Shodogg technology service and failing to complete the technology promised under the Licensing Agreement and Addendum.[163] Defendants advocate for dismissal of Count VI because (a) Plaintiffs failed to cite the exact provisions in the Licensing Agreement or Addendum that Defendants breached; (b) the claim is time-barred because the alleged breach occurred in 2017; and (c) the claim has no basis in fact.[164]

In the Amended Complaint, Plaintiffs allege that the Licensing Agreement and Addendum granted Sykes use of Shodogg's intellectual property.[165] The Addendum was entered into by the parties on April 20, 2017, to extend the term of the Licensing Agreement.[166] Plaintiffs' allegations that Shodogg breached these

---

[161] *See id.* ¶ 138.
[162] I note that a developed factual record may indicate otherwise. However, at the motion to dismiss stage with plaintiff-friendly inferences is not an appropriate point in litigation to determine a fact-intensive question such as the application of a tolling doctrine.
[163] Am. Compl. ¶ 145.
[164] Defs.' OB 37–38; Defs.' RB 21–22.
[165] Am. Compl. ¶ 45.
[166] *Id.* ¶ 47.

contracts by preventing Sykes from accessing and using the licensed intellectual property is directly contradicted by Plaintiffs' further allegations that, despite having his access to Shodogg's technology "turned off," Sykes was still able to operate under the Licensing Agreement.[167]  While Plaintiffs allege this "shutting off" of Sykes access caused Sykes' ability to operate under the contracts to be "more restricted" than previously, Plaintiffs acknowledge that the Sykes continued to access Shodogg's technical software development services used to develop the software at the core of the Licensing Agreement.[168]

Plaintiffs fail to state how the Licensing Agreement was breached if Sykes continued to access the intellectual property at the core of the Licensing Agreement, nor have they alleged that Sykes was damaged by his allegedly "restricted" access that permitted him to continue to perform under the Licensing Agreement.  Thus, with respect to Count VI for breach of the Licensing Agreement and Addendum thereto, Plaintiffs have not sufficiently pled a claim for breach of contract. Accordingly, Count VI is dismissed for failure to state a claim.[169]

---

[167] *Compare* Am. Compl. ¶ 149, *with* Am. Compl. ¶¶ 150–51.

[168] *Compare* Am. Compl. ¶ 150, *with* Am. Compl. ¶ 151.

[169] Because I have dismissed Count VI for failure to state a claim, I decline to reach Defendants' arguments regarding the timeliness of Count VI and whether Plaintiffs were required to cite exact provisions in the Licensing Agreement to adequately place Defendants on notice of the claim.

*F. Counts VII–IX: Breach of Fiduciary Duty*

Plaintiffs assert a breach of fiduciary duty claims against each of the three Individual Defendants based on Sykes' position as a shareholder of Shodogg and the Individual Defendants' alleged misdeeds that harmed Sykes as a shareholder.[170] Defendants advocate for dismissal of Counts VII–IX by attacking each alleged act underlying the claim.[171] Specifically, Defendants (1) claim to have mooted the lack of an annual stockholder meeting by holding such a meeting in December 2022; (2) note that Plaintiffs' information rights are governed by statute; (3) argue that the allegation that the Individual Defendants acted in their own self-interest are wholly conclusory; and (4) aver that failure to honor valid contracts is a bootstrapped contract claim that is barred.[172]

"The plaintiff is the master of the complaint[.]"[173] Accordingly, I will limit my assessment of whether Plaintiffs stated a claim for breach of fiduciary duty to the allegations Plaintiffs have included in support of Counts VII–IX.[174] According to Plaintiffs, each individual defendant breached their fiduciary duties owed to Sykes by: (a) failing to hold an annual stockholder meeting for more than five years; (b)

---

[170] *See* Am. Compl. ¶¶ 157–58, 162–63, 167–68.
[171] Defs.' OB 39–42; Defs.' RB 23–25.
[172] Defs.' OB 39–41; Defs.' RB 23–25. I note that Defendants did not assert in their briefs a Section 102(b)(7) defense. *See* Defs.' OB; Defs.' RB.
[173] *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 23 (Del. Ch. 2009).
[174] That is, without regard to whether facts pled elsewhere in the Amended Complaint could support a claim of breach of fiduciary duty.

failing to provide Sykes with information pertaining to Shodogg's business affairs;
(c) failing to provide Sykes with requested financial records related to Shodogg; (d)
acting contrary to Shodogg's best interests while acting in each defendants' own
self-interest; (e) failing to keep Sykes apprise of important corporate matters; and (f)
attempting to disenfranchise Sykes of his shares in Shodogg.[175] Plaintiffs also allege
that Mitschele breached his fiduciary duties by failing to honor valid agreements
Shodogg entered into with Sykes.[176]

First, I consider Plaintiffs attempt to invoke rights arising under statute as
breach-of-duty claims. Plaintiffs allege that the Individual Defendants breached
their fiduciary duties by failing to comply with the Delaware General Corporation
Law (the "DGCL").[177] Specifically, Plaintiffs allege that Individual Defendants
breached their fiduciary duties by violating Section 211, for failing to hold an annual
meeting, and Section 220 for failing to provide Plaintiffs with requested books and
records.[178] As owners of Shodogg stock, Plaintiffs can exercise their rights to bring
direct actions against the Company for breaches violations of specific provisions of
the DGCL.[179] Plaintiffs have not attempted to vindicate their statutory rights by

---

[175] *See* Am. Compl. ¶¶ 158, 163, 168.
[176] *Id.* ¶ 159.
[177] Pls.' AB 57–59.
[178] *Id.*
[179] *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049–1050 (Del Ch. 2015)
(explaining that the Delaware Supreme Court recognizes "that the DGCL, the certification of
incorporation, and the bylaws together constitute a multi-party contract among the directors,
officers, and stockholders of the corporation. As parties to the contract, stockholders can enforce

31

assert claims for breaches of the DGCL. Instead, Plaintiffs plead solely fiduciary duty claims based on alleged failures of the Company to comply with the DGCL. But this is an improper attempt to bootstrap a fiduciary claim out of a legal claim,[180] and the fiduciary claims based on Sections 211 and 220 are dismissed.

With respect to Plaintiffs' allegation that the Individual Defendants have disenfranchised Plaintiffs by representing that Sykes' ownership interest in Shodogg is only 0.041%, the determination of Plaintiffs' actual ownership amount will be determined under Plaintiffs' request for declaratory judgment. If Plaintiffs are correct, then they will receive declaratory relief to that effect. Alone, Plaintiffs' allegation that the Individual Defendants have misrepresented Plaintiffs' actual ownership in Shodogg does not support a claim for breach of fiduciary duty.

Plaintiffs also allege that the Individual Defendants acted in their own self-interest and contrary to the interests of Shodogg and its stockholders, and that Mitschele caused Shodogg to fail to honor valid agreements. To the extent these

---

it."); *accord Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) ("the general rule under Delaware law . . . is that a plaintiff may not 'bootstrap' a breach of fiduciary duty claim [from] a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty."); *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del Super. July 25, 2007) ("Under Delaware law, a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort."); *see also In re Est. of Tinley*, 2007 WL 2304831, at *1 (Del. Ch. July 19, 2007) (explaining that "the vindication of purely statutory rights represents an exercise of the prerogative of the legislature, and not the equity Court. Such a purely statutory right, therefore, will be enforced by this Court not as a matter of equity, but of law").

[180] *See id.*

allegations state a claim, that claim is derivative in nature because the harm caused by these breaches of fiduciary duties, and the remedy thereto, would run to Shodogg, not Plaintiffs individually.[181]  Therefore, Counts VII–IX are dismissed for failure to state a claim.

### III. CONCLUSION

Defendants' motion to dismiss Counts IV and VI–IX are GRANTED. Defendants' motion to dismiss Count II is GRANTED IN PART.  Defendants' motion to dismiss Counts I, III, and V is DENIED.  The parties should submit a form of order consistent with this memorandum opinion.

---

[181] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021) (quoting *Tooley v. Donaldson, Lufkin & Jennette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (reaffirming the *Tooley*, *i.e.*, to decide if a claim is direct or derivative, the Court must only consider "(1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?").